STATE OF MINNESOTA                                        DISTRICT COURT

COUNTY OF HENNEPIN                                 FOURTH JUDICIAL DISTRICT

Charles Turner,
                                                          Case Type: Employment
                          Plaintiff,
                                                          Court File No. _____
v.

Accenture LLP,                                  **SUMMONS**

                          Defendant

THIS SUMMONS IS DIRECTED TO ACCENTURE LLP

1.      YOU ARE BEING SUED. The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

2.      YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS. You must give or mail to the person who signed this summons a written response called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons located at:

          Kuhlman Law, PLLC
          333 Washington Ave. N., Suite 335
          Minneapolis, MN 55401

3.      YOU MUST RESPOND TO EACH CLAIM. The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.



4.     YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS. If you do not answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

5.     LEGAL ASSISTANCE. You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.

6.     ALTERNATIVE DISPUTE RESOLUTION. The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

The object of this action is Employment.

Dated: May 27, 2015                          **KUHLMAN LAW, PLLC**

Christopher J. Kuhlman, Atty. No. 0386840
333 Washington Ave. N., Suite 335
Minneapolis, Minnesota 55401

ph. 612.349.2747
fax 612.435.9835

ATTORNEY FOR PLAINTIFF

STATE OF MINNESOTA                               DISTRICT COURT

COUNTY OF HENNEPIN                        FOURTH JUDICIAL DISTRICT

---

Case Type:          Employment

Court File No.:

Charles Turner,

                  Plaintiff,

vs.                                              **COMPLAINT**
                                            **JURY TRIAL DEMANDED**

Accenture LLP,

                  Defendant.

---

    Plaintiff Charles Turner, for his Complaint against Defendant above-named, states and alleges as follows:

## PARTIES

1.  Defendant Accenture LLP, ("Accenture") is a foreign limited liability partnership that operates globally and in Minnesota. Its Minnesota Registered Office Address is 5200 Wilson Rd, #150, Edina, MN 55424

2.  Plaintiff Charles Turner resides in Hennepin County, MN. He was employed by Defendant from approximately December 2000 until approximately December 10, 2014.

## JURISDICTION AND VENUE

3.  The Court has original jurisdiction to hear Plaintiff's claims under Minnesota statute § 181.935.

4.  Venue is proper in Hennepin County because Defendant's place of business where Plaintiff was employed is in Hennepin County. Additionally, the unlawful acts alleged in this complaint were committed in Hennepin County, Minnesota.

## FACTS

5.  Plaintiff was employed by Defendant.

1

6. Defendant is a multinational management consulting, technology services, and outsourcing company and is a publicly traded company on the New York Stock Exchange.

7. As a publicly traded company, Defendant is subjected to SEC regulations regarding accurate reporting of meaningful financial information to the public.

8. Plaintiff worked for Defendant for approximately 14 years and received positive annual reviews.

9. In 2014, Plaintiff was employed as a Client Financial Management – Senior Specialist.

10. As a Client Financial Management – Senior Specialist, it was Plaintiff's job to provide a supportive role for financial review and assist Defendant with consistent financial goals attainment to make sure collecting everything owed under contracts such as receivables, billing, and invoicing.

11. As a specialist, Plaintiff was not in a managerial role where he made financial decisions. Nor as a specialist did Plaintiff have the authority to report or reassign losses or even to submit monthly financials or report monthly financials on the account.

12. In approximately late June or early July of 2014, Plaintiff was transferred to the Xcel Energy account and was to report to Nadir Kahn, Client Finance Management Lead/Manager.

13. Defendant had been contracted by Xcel energy to provide consulting services involving software implementation and reviews, including Productivity Through Technology, all of which were encompassed under a Master Statement of Work ("MSOW") which had been entered between Defendant and Xcel.

14. The MSOW encompassed hundreds of millions of dollars of fees for Defendant for providing these consulting services to Xcel.

15. To accomplish the overall goals and objectives of the MSOW, Individual Statements of Work ("ISOWs") were created and entered into between Xcel and Defendant.

16. Each smaller ISOW had a detailed objective and budget for costs, expenses, and billings. Fees and revenue stemming from the ISOWS would be drawn down against the overall total value of the MSOW.

2

17.  To perform its consulting and software implementation deliverables under the MSOW, Defendant hired software subcontractors and specialists to perform work on Xcel's ISOW.

18.  After several weeks on Xcel's account, Plaintiff noticed that Accenture had been fraudulently billing Xcel for work that did not comport with the terms of the ISOW contract or the MSOW contract.

19.  Specifically, Plaintiff noticed that there were significant cost overruns

20.  Plaintiff noticed that Defendant was drastically over budget in both the billing of fees and expenses for the current ISOWs that had been agreed to by the parties.

21.  Even though Defendant had not completed the deliverables of ISOW #1 and had already exhausted its budget for its billings and expenses contained within ISOW #1, it would take moneys allocated from subsequent ISOW #s 2 and 3 to complete work on ISOW #1.

22.  To mask its failure to complete deliverables under the initial ISOWs and its improper use of funds under the MSOW, which had been allocated for future deliverables, Defendant manipulated its billing statements so that Xcel could not recognize that work and expenses it contracted for under the previous ISOW were being pushed to the successive ISOWS.

23.  Specifically, Defendant concealed what it was doing from Xcel by omitting employee and contractors' names, times, dates of work, hours, and gross amount of expenses from Xcel's billing statements.

24.  Rather than admit to Xcel that Accenture was seriously over budget in billing and expenses for the specific ISOW and recognizing the appropriate loss pursuant to GAAP principles, Accenture opted instead to re-allocate the work done in excess of the initial ISOW's terms towards future clearly defined ISOWs that had yet to be executed.

25.  Defendant's conduct of not recognizing losses on the Xcel contracts and deceptively kicking the losses and billings out indefinitely to future ISOWs that had not even formally been agreed to by the parties, caused Defendant to not accurately reflect its true and accurate financial picture of the losses attributable on the Xcel account.

26.  Rather than recognize millions of dollars in margin losses, Defendant omitted these figures and also fraudulently misrepresented future backlog revenue attributable to the Xcel account.

3

27.    Thus, in its quarterly and annual SEC filings, Defendant was still reporting a profit attributable to its consulting work done in the utilities industry when in actuality, there was a loss of millions of dollars of margin that should have been reported and recognized.

28.    After several weeks on the Xcel account, in approximately early July of 2014, Mr. Turner noticed that Defendant was improperly billing Xcel and was failing to report significant financial losses attributable to the account. Plaintiff brought this to Nadir Kahn's attention and told him that Accenture needed to take millions of dollars of losses for July of 2014.

29.    Mr. Kahn attempted to trivialize the significance of Defendant's failure to recognize and report these losses and encouraged Plaintiff to continue to manipulate the Estimates at Completion ("EAC") numbers.

30.    Plaintiff refused and orally told him multiple times that Defendant was misleading investors and generating incorrect and misleading financials and bogus future financial projections.

31.    Each time, Kahn became upset and said that Plaintiff was not being a "good team member" and that the numbers could somehow be "changed" in the future.

32.    This conversation occurred several times each week over multiple months and after getting an opportunity to fully appreciate the numbers, in August, Plaintiff told Kahn orally that what was occurring was outright fraud.

33.    Kahn never attempted to correct the behavior or to report the accurate numbers.

34.    Because Kahn was not taking Plaintiff's concerns seriously, Plaintiff went above him to the Client Account lead and senior executives on the Client Account, including Larry Stewart in approximately the beginning of September.

35.    Mr. Stewart said that this was not his area to address and directed Plaintiff to continue to resolve the issue with Nadir Kahn and work directly with Kimberly Hartzfield.

36.    At the September 1st meeting, Hartzfield was upset by the fact that there was millions dollars of losses that had not been accounted for. It was Hartzfield's job to show an improved profit on the Xcel account as the PTT lead and to ultimately submit the final financial numbers on the Xcel account that would be provided to investors. At the meeting, Kahn told Hartzfield to submit the financial report with the fraudulent data not recognizing millions of dollars of losses. Plaintiff spoke out

4

and said that this was not correct and because it was the end of the fiscal year, that these losses should have been recognized much earlier and that this was Defendant's last chance to do the right thing and recognize this loss during this fiscal year before the records were closed.

37.   Hartzfield was upset, but said that she would submit the fraudulent financials this time, but this would be the last time.

38.   After the meeting, for the next several weeks, Plaintiff, the team, and the PTT project managers worked on reviewing all past historical data on ISOWs 1-5 where Accenture had billed Xcel for completion of the projects, even though the projects had not been completed, and losses had not been recognized.

39.   After completing this review, Plaintiff was able to definitively appreciate that Defendant had not recognized millions of dollars of losses on this account and not properly reported those losses.

40.   On October 2, 2014, there was a monthly financial review and forecast submission telephone meeting in which Kahn, Plaintiff, Hartzfield, and other members of the finance team participated. This call was scheduled to finalize the contract's actual finances through September and forecasted results for the remaining life of the contract. Once submitted, this information would go to Defendant's corporate finance department which includes this data in SEC disclosures for quarterly earnings calls with investors and stakeholders.

41.   During the call, Kahn attempted to submit financials during this matter showing that there were no losses on the Xcel contract.

42.   Plaintiff spoke out again and informed the team that Accenture needed to take the loss and that this should have been done last month.

43.   Plaintiff further reiterated that he had tried to work with the team previously to correct the report and told it previously that it needed to take losses that had already occurred. This time, Plaintiff said that if Accenture submitted Kahn's numbers, that doing so would be illegal.

44.   Hartzfield responded by saying that she would not submit the fraudulent financial numbers not recognizing losses, even though it was her job to sign off on the financials submitted to the corporate finance department. Kahn, volunteered that he would sign-off on the financials so that Hartzfield did not have to.

45.   The fraudulent financials were submitted.

46.   The following Monday, approximately 2 business days later, Plaintiff received a call from Howard Cronin and Kahn saying they needed to speak with him.  During a meeting with Cronin and Kahn later in the date, they placed Plaintiff on a 60 day Personal Improvement Plan "PIP" that was inaccurate.

47.   Plaintiff refused to sign the Personal Improvement Plan ("PIP") and called H.R. and set up a meeting several days later.

48.   At the meeting, Turner told the H.R. representative, Mr. Erik Renk-Grant that he had spoken out against illegal accounting practices and fraud on the Xcel account and felt that the PIP was retaliation.

49.   Kahn instructed Plaintiff that going forward, he would be running the financial review calls and submissions for the Xcel Account and that he would run the meetings and that Plaintiff should not speak at any other meetings and that his job was to just take good notes on the calls and not participate.

50.   Plaintiff who worked for fourteen (14) years for Defendant was terminated at the conclusion of his 60 day "PIP" for inaccurate reasons.

## COUNT ONE

### VIOLATION OF MINNESOTA'S WHISTLEBLOWER LAW

51.   Plaintiff re-alleges every paragraph of the Complaint.

52.   Defendant's policies and practices described above, constitute an intentional, willful, knowing, and deliberate violation of Minn. Stat §181.932.

53.   Plaintiff made several good faith reports of a violation or suspected violation of federal or state law or rule adopted pursuant to law.

54.   After making these reports, Defendant took adverse action against Plaintiff as described in detail above and ultimately terminated him.

55.   Plaintiff reasonably used any complaint procedures available.

56.   At all relevant times, Plaintiff was an "employee" and Defendant was an "employer" under the MWA and other pertinent law.

57.   As a direct and proximate result of the acts alleged above, Plaintiff has been and continues to be damaged and suffer losses including, but not limited to, lost income, benefits, and lost earning capacity, past and future, emotional distress, physical and

6

mental anguish, in an amount to be determined at trial.

WHEREFORE, Plaintiff prays that he be granted the following relief:

1.     A declaratory judgment that the practices complained of herein are unlawful and

       violative of the MWA and other pertinent law.

3.     An Order requiring Defendant to compensate, reimburse and make whole Plaintiff

       for his losses attributable to Defendant's misconduct including but not limited to,

       back and front pay, benefits, training, promotions and seniority.

4.     An award to compensate Plaintiff for the pain, suffering and humiliation caused by

       Defendant's unlawful treatment.

5.     Punitive Damages.

9.     The Court to award Plaintiff costs, disbursements and expenses of this action,

       including reasonable attorney's fees as provided in the MWA and other applicable

       law.

10.    All other remedies available at law.

       **Plaintiff demands a trial by jury on issues triable to a jury.**

Dated:  5/27/15                          **Kuhlman Law, PLLC**


                                         Christopher Kuhlman, #386840
                                         333 Washington Ave. N., Suite 335
                                         Minneapolis, Minnesota 55401
                                         (612) 349-2747

                                         ATTORNEYS FOR PLAINTIFF

7

### ACKNOWLEDGMENT REQUIRED BY
### MINNESOTA STATUTE § 549.211

The party represented by the undersigned hereby acknowledges that pursuant to Minn. Stat. § 549.211, monetary and/or non-monetary sanctions may be imposed for claims made in violation of that statute.

Date: May 27, 2015

Christopher Kuhlman

8